We're ready to get started and thanks, counsel, for your patience in our delayed start. I'll call the first case, Lane v. Riverview. Mr. Sink. Good morning and may it please the court. The ultimate issue in any employment discrimination case, regardless of proceeding under the direct or indirect method of proof, is whether a reasonable jury can find that would permit a reasonable jury to find race discrimination. First, the presence of a proper comparator, an individual by the name of Matt Rainey, who was not terminated for his violation of the same policies. Second, two race-based comments by Ann Cuse, the decision-maker behind Mr. Lane's termination. And third, material misrepresentations made by Riverview to the Equal Employment Opportunity Commission specifically as to Ms. Cuse's knowledge of the Matt Rainey incident. Now, these three categories of evidence were either explained or disregarded by the district court. However, it's Lane's contention they do provide enough circumstantial evidence to create an issue of fact for the jury. So, starting with the first category of evidence, the district court held that Mr. Rainey was not a proper comparator because Ann Cuse was allegedly not a decision-maker. Under Coleman, a decision-maker is someone who is responsible for the outcome. So, not solely responsible or exclusively responsible, but responsible for. Here, the evidence is sufficient to show that Ms. Cuse is as responsible for the outcome of Matt Rainey as Joyce would. She was the executive director of HR for the entire hospital, so there are no separate HR managers for each department. She's in charge of the termination of all non-physicians, which would include both Lane and Rainey. Managers such as Wood do not even have the option of pursuing termination. So, when it comes to deciding whether or not to pursue termination proceedings, that's a decision solely up to Ms. Cuse. Mr. Sink, on the Rainey situation in your brief, you seem to want to have us take Ms. Areola's version of what happened with Rainey at face value. Does your argument depend on whether we need to do that? Well, that's an important distinction. I will admit the brief did highlight Ms. Areola's declaration and her deposition. However, we contend the memo that was provided to Ms. Cuse is sufficient to put her on notice of the underlying conduct. Isn't at least one elementary question whether the hospital believed their policy had been violated? Correct. That is an issue, and our contention is if you look at the memo that was given to Ms. Cuse, it states in there twice that Mr. Rainey had unconsented physical contact with Ms. Areola, and it states that law enforcement was called. So, if you put two and two together, obviously the fact that she called law enforcement shows she did not consent to the touching. Law enforcement was called by Ms. Areola? By Ms. Areola, correct. But would you agree that, okay, so you're not asking either the district court or this court, in essence, to try what happened between Mr. Rainey and Ms. Areola, are you? No, we're not doing that. It is our contention that the information that was provided to Ms. Cuse would have alerted her to a violation of the anti-violence policy. Do you agree that Mr. Lane's slap of this young man who seemed to be out of control actually violated the policy? No, we do not agree to that. Mr. Lane admits to the underlying conduct. However, he does not admit that he violated policy. It's his contention as a security officer and as a law enforcement officer, he has the authority to use some level of force. He contends it was a reasonable force that he used. It did work, didn't it? It did work, correct. And he's the person you call in a situation of deal. Could I ask you about the issue of constructive discharge? We obviously don't have unlimited time here. Did Mr. Lane actually sign any agreement for his separation? No, he did not. He was asked to sign a release that had a number of terms in it. He did not. He never submitted a resignation letter. He never signed any kind of agreement. Go ahead. I just wanted to know about his supervisor, Scott Tripp. What evidence was there that he knew about, at the time the decision was made, what had happened with the other employee? With Matt Rainey? Exactly. Frankly, no evidence. Really, his case hinges on and Cusay is a key behind Matt Rainey's incident and Mr. Lane's termination. So, inferentially, you're trying to make that leak? We don't contend. Scott Tripp was really the decision maker behind Lane's termination. We attribute his termination to Ms. Cusay. Did he have the power to terminate? No, he did not. Well, it had to go through Cusay. Cusay has to start the termination proceedings, then that ultimately goes to the executive steering group, and then they either approve or disapprove. Can I ask you about Ms. Cusay's comments? You refer to them kind of generally as race-based comments. I was looking in those for some indication of hostility based on race and having trouble finding it. Sure, they're not to them. However, they do show that her first comment was she did not want any trouble with another employee because he was black. That was the head of the security department? Correct, yes. And I guess I'm you're not trying to argue that any employer or supervisor's comment or question about race is enough to raise an inference that race matters to the speaker in the decision in question, are you? No, that's not our contention at all. Let me put it this way. Make the jury argument to us as to what inferences you think should be drawn from these two rather mild comments or questions. Well, the first comment, she did not want any trouble because he's black. I mean, the argument is she's acting on stereotypes of African-Americans. And you have a situation with Lane who used force in investigating the matter. She specifically said, she inquired into the race of the boy. That was a story that Lane told, a long story. Short, she specifically said in her deposition, while we do have a Caucasian patient that was struck by an African-American man, I wanted to know if race was involved. So you have two situations where she's injecting race. Well, is that unreasonable on her part? And particularly, you've got Mr. Lane telling her that this boy had used just vicious language toward him. The second comment, yes, Lane did mention prior to her asking that question. The first comment. Well, I mean, it seems pretty normal to worry at least about that. Well, she didn't ask why did you tell me that story or what's the basis behind this. Instead, she said, what's the race of the boy? And then when asked to explain it, she immediately went to the race of Lane and the race of the victim. But the first comment, there's no mention of race or anything like that. It just comes out of the blue because he's black. I mean, the argument we'll make is she's injecting race into a situation where race really is neutral. It has nothing to do with race whatsoever. In addition to those comments of the kicking, biting and spitting, how extensive is that that the records show in terms of the kicking? Yeah, it's very detailed. We have testimony from Mr. Lane that this patient was very dangerous. The nurse was afraid to enter the room. As soon as he enters the room, he kicks a caregiver across the room. As soon as he touches a patient, the guy screams to watch it. He bites. Patient tried to bite his hand, spit in his mouth once. Then he does the open hand slap to prevent the patient from spitting a second time. Furthermore, on top of all that, we have Dr. Rieger who strongly advocated to keep Lane employed and advocated that what he did was reasonable under the circumstances. Was Rieger present at the time? I don't know if he was. I know he was the attending physician for the patient. That also goes back to the Matt Rainey incident as well. One of the alleged distinctions is that you have witnesses who advocated for Rainey while Lane had Dr. Rainey as well. Really, once the court finds that Mr. Rainey is a proper comparator, all of the other evidence fits in along with the misrepresentations that were made to the EDEOC. Alright, do you want to save some time for the vote? Yes. Alright, thank you. Ms. Martin? May it please the court, I'm Lori Martin, counsel for Riverview Hospital. As the court has heard, Mr. Lane was called to assist with a patient, saw this patient who Mr. Lane reports is approximately 140 pounds, laying on a bed throughout an entire incident, was informed the patient was lashing out, was informed the patient was spitting. Mr. Lane's first tactical error, so to speak, was entering this room without putting any protection or mask on Mr. Lane's own face and choosing an initial method of restraint with his hands on the patient's shoulders that did put him face to face with the patient. When the patient did unfortunately spit at Mr. Lane, his testimony is he takes a step back, he pulls his arm back even with his shoulder, he slaps the patient hard in the face, solid contact are the phrases that Mr. Lane uses to describe what he did. Mr. Lane was terminated for this conduct. Well let me go back, you're not disputing the kicking and all the other things that happened right before that, are you? Mr. Lane did, his testimony is that he saw the patient kick a caregiver. Mr. Lane also was and your nurse was afraid even to go in the room, right? The nurse was concerned about the patient. And she conveyed that to Lane, right? She did. So he knew that when he went in, that she felt frightened that she didn't even want to go in the room, because I'm trying to get to why this was a violation, why the force that he used was not reasonable. Well here's Riverview's policies on this issue. Riverview has a restraint and device policy. This policy prohibits any form of restraint that is used as a means of coercion, discipline, or retaliation by the staff. And Riverview was also, so Mr. Lane's own testimony is that is exactly why he used this restraint in this method. He slapped the patient's face. I think it didn't physically prevent the patient from spitting again. It shocked the patient into submission here. It shocked some other people as well. But that does not mean this is a form of restraint that is acceptable to Riverview. Mr. Lane's actions... He's not a nurse. He's a security officer. Is he supposed to retreat? Well let's talk about this duty of retreat. There's nothing in the record from a policy standpoint of either this statement that Lane had a duty not to retreat. What we do know is that... What were his responsibilities? Do we have his job description or policies dealing with protection of other staff and patients in the record? Mr. Lane's responsibilities include applying appropriate restraint when necessary, and they do include assisting staff as necessary. What we also have in the record are some de-escalation techniques. So let's distinguish retreat, leaving the scene, leaving the building, from taking a step back and evaluating what's the real risk here? What's the risk of me taking an alternative method with this individual? And we have the statement of Sheriff's Chief Deputy Major Tom Gelhausen that Riverview did contact to find out whether what Lane did was consistent with his Sheriff's Department training. They knew it wasn't consistent with their policies. They asked the Sheriff's Department, is this consistent with your training? And we have no dispute there either. The Sheriff's Department said this is not consistent with my training and proposed exactly what Riverview may have preferred here, that an alternative would have been take a step out of the range of the patient, de-escalate the situation rather than resorting to violence. And Lane's subjective beliefs about the reasonableness of his conduct here are insufficient as a matter of law. And we're also straying into that territory where the court, nor any jury, is entitled to second guess the reasonable beliefs of Riverview. And here they did reasonably believe. I think we realize that. The concern though, frankly, is when we look at this record and look and compare the Rainey incident, it looks like Rainey, who's white, quickly gets the benefit of the doubt from other people within the hospital in a way that plaintiffs did not. Well let's talk about Matt Rainey and some of the legitimate differences between Rainey and Lane themselves and the two incidents that we are looking at here. First, Mr. Rainey is a nurse. You asked earlier, is Mr. Lane a nurse? No, he's not. Mr. Rainey is. Mr. Lane made a significant error of judgment that resulted in him getting reported by the patient's caregivers for child abuse to the Department of Child Services. Which was rejected. Well, no action was taken by the Department of Child Services. The report certainly occurred and certainly something Riverview doesn't prefer. But Rainey also got reported, right? But to the Sheriff's Department, not to DCS. So is that a critical difference? Well, it is. We have the Sheriff's Department view of the Lane incident here. The Sheriff's Department concluded Mr. Lane did not act appropriately in the circumstances, doing exactly what he was hired to do and exactly what he was trained to do. They offered an opinion. They took no action, correct? That's correct. And DCS took no action about Rainey. DCS kicked that report, which they decided internally not to take action on, to the Hamilton County Sheriff's Department, local law enforcement, which initiated a criminal investigation of Mr. Lane. This was after his termination. But the DCS report itself and the fact that they had a security guard investigated by the Sheriff's Department for child abuse, admittedly no prosecution. These are not the types of behaviors that Riverview believes reflect positively on the hospital. Or that reflect a way they want them to handle this. Looking at Mr. Rainey, he's a nurse. He's hired and trained to provide care. He found himself in a situation he was not trained extensively to handle. He handled it, perhaps even if it was an error of judgment. But they determined he was going to be counseled and they issued departmental training. How do we teach our nurses to de-escalate these circumstances? That was 18 months prior to Mr. Lane's slapping of the patient. What difference does that make? We have the de-escalation techniques. What difference does the 18 months make? Right. So after Mr. Rainey issued, or after the de-escalation techniques were issued to the department 18 months prior to the Lane slapping, Lane disregards each one of those de-escalation techniques in his handling of the patient. So you're saying those techniques were implemented after the Rainey situation? It was advice. Go ahead. Sorry. It was advice that was issued by the then Chief of Security, Clifford Blackwell, as to how these situations should be handled. Clifford Blackwell testified, Patty Ben employed at the time, he was not at the time of the Lane incident, that Mr. Lane would also have been expected to try and follow those techniques. Another error, if you want to add that to the list, of the judgment that Mr. Lane exercised in handling the patient by slapping his face. The different decision makers that handled the Lane and the Rainey incidents are another significant factual and legal difference between those two circumstances. Joyce Wood, the Director of Nursing, and Tammy Nash investigated, made the decision, conveyed that decision to Mr. Rainey. Ms. Wood faced conflicting reports and had to make a credibility call as to what even happened involving Mr. Rainey. And we have the Sheriff's Department opinion regarding Mr. Rainey, which is that Mr. Rainey was not acting in any criminal manner, that he was performing a function of his duties as a nurse, and that he admitted touching the mother, but it was not in a rude, insolent, or angry manner. So we have vastly different third-party Sheriff's Department opinions about the conduct of Mr. Lane and the conduct of Mr. Rainey. The Lane incident was handled by Scott Tripp and Ann Cusay. They investigated, they agreed he violated Riverview's policies. Tripp didn't have the joint decision of Tripp and herself that he had violated Riverview's policies to the Executive Steering Group. The Executive Steering Group conditionally approved Lane's termination, contingent on confirming whether the Sheriff's Department believed Lane had acted appropriately or not. As we know, the Sheriff's Department confirmed to Ms. Cusay that they did not believe Lane's conduct was consistent with his training. Ms. Cusay passed that back to the committee and was authorized to proceed with accepting his resignation or termination if necessary. So each of those factors, in addition to the different duties and backgrounds that explain why there may have been legitimate different expectations of how they would have handled these two situations, are legitimate reasons for the different treatment of Lane and Rainey. And this court has stated that even if employees are similarly situated, if the employer has provided legitimate reasons for the different treatment, it's the plaintiff's burden to prove affirmatively that race was the reason for that treatment, and this is where Mr. Lane's case falls well short. Can we talk about the statement to the EEOC? Yes. This is fairly unusual evidence where an employer has made a factually incorrect, clearly, I mean, black and white, it's over misstatement of a critical fact to the EEOC. Well, two disputes there. The criticalness of this fact to Mr. Lane's case and the criticalness to our arguments, but first off, the character... You're not trying to suggest that the Rainey incident is irrelevant, are you, in the litigation? No, what we are saying is that it is undisputed that Ms. Cusay did not investigate, did not make any decision regarding Mr. Rainey. She reviewed a memo, you know, under a favorable interpretation, she spent 30 minutes with a memo, she's executive director of a hospital with 1,300 plus employees, 30 minutes with a memo, 18 months prior to Mr. Lane's termination. You've got an argument that it was an innocent and understandable mistake, right? She did not recall it. And that may very well have been, but as I've been listening to you this morning, I've been saying these all sound like great jury arguments to me. So why is it appropriate for summary judgment? And particularly, can I just add to that the two comments that she made? So there's the mix about Lane. Well, let me make sure first I've clearly answered the question about the statement to the EEOC. Counsel's characterization in the position statement of the fact that she wasn't involved or wasn't involved in making any decision about Rainey as a lack of awareness is what occurred. Ms. Cusay did not recall that memo, and we do not rely on her lack of memory as a defense in this case. What we say is fine. Ms. Cusay was aware of the content of this memo in February of 2011. The memo does not identify Mr. Rainey's race. She did not know Mr. Rainey's race. The memo identifies his conduct as moving the hand of a mother to prevent harm. The memo incorporates the Sheriff's Department's conclusion that Mr. Rainey did not act inappropriately. So Ms. Cusay's knowledge is a very filtered benign version of any dispute that may be in the record that Ms. Wood faced about what happened. So even assuming that she was aware of this and knew of it, even if she had the memo in the meeting when they were discussing Lane, there are legitimate reasons that these individuals were not treated as similar. And back to your question about the neutral comments. First, let's look at the record about what it is alleged Ms. Cusay said. And she does deny this comment. There's an affirmation from a former Riverview security guard, Kim Spinner, who had accused the then, sorry I see my time's up, who had accused the chief of Riverview security at the time of theft. She doesn't recall the words Ms. Cusay used. She claims Cusay said, quote, something to the effect that she did not want any trouble because Blackwell was black. Blackwell was not terminated. Blackwell resigned. The allegations against Blackwell were not substantiated and Ms. Cusay's testimony is in the record that she was concerned about people jumping to conclusions about Blackwell. So what we have is not even a remark to the extent it doesn't support any animus or discriminatory context. Even if it did, it's not about Lane. It's not to Lane. It's not about the decision about Lane. And it was eight months prior to Mr. Lane's own termination. All right. Thank you. Thank you. How much time does he have? Say it out loud so he can hear. Thirty seconds. OK. I'll try to make this as quick as possible. First, we do have misrepresentations to the EEOC in the position statement. And on May 13 of 2015, Ms. Gordon Castro of the DeVry University specifically found pretext where an employer misrepresented the decision maker's knowledge of protected activity. That's essentially what happened here. They claim she didn't know about Matt Rainey. We get into discovery. The memo and email showed she did know about it. Her only explanation is, oh, I forgot. Very convenient, self-serving amnesia excuse. Absent cutting open her head and reading her mind, there's no possible evidence we would have to refute that. So that's why we have juries. It's a credibility issue for the jury to decide that. There is evidence in the record that there was a duty not to retreat for security officers and because they testified to that and Blackwell testified to that as well. The Sheriff's Department opinion came out after the decision to terminate. And I see my time is up. You can go ahead. The Sheriff's Department opinion came out after the decision to terminate. After Lane had already been told his employment would end, he needed to resign. And after the executives hearing group had already been confronted and voted on the decision to terminate. Mr. Lane. All right. Thank you. Thank you both. Counsel will take the case under advisement.